## BALL *v.* HARPHAM.

1. STATUTE OF FRAUDS—SALE OF LAND—EXECUTORY CONTRACT—
VALIDITY.

   A verbal executory agreement to purchase real estate subject
   to the back taxes thereon is void under the statute of frauds.

2. SAME—ESTOPPEL.

   A verbal executory agreement to purchase real estate, void
   under the statute of frauds, is a mere nullity, and cannot be
   made the basis of an estoppel against defendants' right to ac-
   quire an adverse title.

3. TAXATION—SALES—RIGHT TO PURCHASE.

   Where defendants entered into a verbal executory agreement
   to purchase certain land subject to the back taxes thereon,
   which agreement they failed to keep, they did not thereby be-
   come obligated to pay the taxes, and their purchase of the
   State's tax title to the land did not operate as a mere pay-
   ment of the taxes.

4. SAME—FRAUD.

   Defendants, after learning through negotiations to purchase
   certain lands, that petitioner was unable to pay the taxes de-
   linquent thereon, agreed, by parol, through their agent, to
   purchase the same subject to the taxes, and induced her to
   believe that they would carry out such contract so that she
   executed a warranty deed subject to the taxes and deposited
   the same in escrow for defendants' benefit. While the deed
   was lying in escrow defendants secretly purchased the State's
   tax title to the land, and subsequently refused to carry out
   their contract with petitioner. *Held,* that such acts consti-
   tuted a fraud on petitioner entitling her to recover the land
   on payment of the amount paid by defendants to the State
   for taxes, with interest, within a reasonable time. OSTRAN-
   DER and CARPENTER, JJ., dissenting.

Appeal from Newaygo; Palmer, J. Submitted Jan-
uary 19, 1905. (Docket No. 76.) Decided July 21, 1905.

Petition by Florence Ball against John N. Harpham
and George A. Over to set aside certain tax deeds. De-

fendants filed an answer in the nature of a cross-bill to quiet title. From a decree for petitioner, defendants appeal. Affirmed.

*Kingsley & Wicks* (*M. Brown* and *Cogger & Broomfield*, of counsel), for petitioner.

*E. J. Marsh* and *Frank Dumon*, for defendants.

BLAIR, J. The petitioner filed her petition against the defendants in the circuit court for the county of Newaygo, in chancery, in the matter of the general petition of the auditor general for the sale of lands in Newaygo county for unpaid taxes. The defendants became parties to the tax proceedings by purchasing from the State and applying to the court for the usual writ of assistance.

The petitioner alleges in her petition that she is the owner of some 2,440 acres of stump lands in Newaygo county of the value of "several thousand dollars;" that, owing to lack of funds, she has been compelled to allow the annual taxes thereon to remain unpaid for the years 1891 to 1901, both inclusive; that she has been willing to sell said lands at a sacrifice in order to pay off the delinquent taxes and obtain a balance for herself; that in July, 1902, petitioner—

"Authorized Mr. J. C. Shinkman, of Grand Rapids, Michigan, to negotiate a sale of the same for the purposes aforesaid; that said Shinkman, as her agent, entered into negotiations during the month of July with one Theobold Harter, of Big Rapids, Mecosta county, Michigan, then representing said John H. Harpham and James Over, who were and still are nonresidents of the State of Michigan. Your petitioner further shows that said Shinkman, as the agent of your petitioner, stated fully all of the facts and circumstances relating to her title to said lands, together with the question of the unpaid taxes thereon, and also, as a part of such negotiations, fully informed the said Theobold Harter, as agent aforesaid, of her pecuniary inability to pay off the tax liens on said lands otherwise than through the sale of them; that such information was imparted in good faith by said Shinkman to said

Harter, relying upon said Harter's assurances that a sale to his principals could be effected and carried through on the terms and conditions offered by the said Shinkman on behalf of your petitioner. Your petitioner further shows that a verbal executory contract was entered into between the said Harter as the authorized representative of said John H. Harpham and James Over, whereby said last-named parties were to furnish the money to pay off all of said back taxes, and your petitioner was to convey by warranty deed her title to said Theobold Harter for the net sum of $900 over and above the said delinquent taxes.   *   *   *
Petitioner did, on the 29th day of July, 1902, execute a warranty deed conveying to said Harter all of the aforesaid lands. That the said warranty deed was, by the said Shinkman, deposited in escrow with the Citizens' Bank of Big Rapids, in accordance with the terms of the aforesaid verbal contract and arrangement, and as a part thereof, for the sale and purchase of all of said lands.   *   *   *

" That said Harpham and Over disregarded their contract and fiduciary relations with your petitioner, and in violation of their duty requiring them to pay and care for such taxes, and not take advantage of the confidential information communicated by your petitioner's agent to them, nor of your petitioner's pecuniary embarrassment, did wrongfully permit and cause said lands to be sold for the delinquent taxes, and did purchase the same from the State for such delinquent taxes. The said Harpham and Over received a tax deed or deeds for such lands from the State, and now assert as against your petitioner adverse title, through such sale and purchase, to all of said lands."

Petitioner charged :

" (*a*) That the aforesaid arrangement made to purchase said lands from your petitioner and the treacherous conduct of said John H. Harpham and James Over incapacitated them and each of them from becoming lawful purchasers of the legal title of said lands under the said pretended tax sale purchase.

" (*b*) That the demand of the 100 per cent. penalty from your petitioner is contrary to equity and good conscience; that it is extortionate and oppressive.

" (*c*) That the payment of the said $2,702.73 by John H. Harpham and James Over did, by operation of law, amount to the payment and redemption by your petitioner

of all of said tax liens adjudged as aforesaid upon said real estate.

" (d) That said Harpham and Over did not, by virtue of their said alleged tax deed, acquire any legal title to said lands, but in equity became subrogated to a mere lien in an amount equivalent to the benefit received by your petitioner."

Defendants answered, denying that Harter was their agent, or was authorized by them to negotiate for the purchase of petitioner's lands, or that they ever agreed with petitioner or her agent, Shinkman, to purchase the lands or pay the taxes, or that they sustained any contract or fiduciary relations with petitioner which should estop them from acquiring a tax title to the lands. Defendants also claim that petitioner's pretended title constitutes a cloud on their title, and, claiming the benefit of a cross-bill, ask for a decree quieting their title.

The testimony of the parties was taken by deposition. The testimony of Shinkman, Harter, and Lawrence was taken in open court. After hearing the testimony, the court made a decree finding that the material facts stated in the petition were true, and ordering that the writ of assistance be stayed on condition that petitioner deposit with the register of the court, to be paid over to the defendants, the amount paid by them to the State for taxes, with interest, within two months after the decree should become final, and providing that defendants should have a lien on the lands for that amount. It was further ordered that in case petitioner made default in paying off the lien her petition should be dismissed. From this decree the defendants appeal to this court.

After a careful examination of the testimony in the case, we are satisfied that the material facts underlying the transaction between the parties, briefly stated, are substantially as follows: The petitioner, through inability to raise the money to pay the taxes on the lands in question, had permitted them to be sold for taxes for the 10 successive years preceding the oral agreement to sell to Harter.

Since 1900 petitioner had been endeavoring to sell the lands through Mr. Shinkman and Mr. Lawrence, and Lawrence had broached the subject to Harter in the winter of 1901–1902. Lawrence did not have full authority to sell the lands, but brought about a meeting between Harter and Shinkman at Big Rapids. Harter was familiar with the lands, and represented the defendants as their agent at the meeting at Big Rapids, and Shinkman represented the petitioner as her agent, although neither had any written authority. On July 25, 1902, Shinkman met Harter at Big Rapids—

"To see if we could not negotiate a sale. I asked the price of $1,000 for Mrs. Ball's interest. I think my proposition first was that she would give a quitclaim deed. Later I agreed that Mrs. Ball would give a warranty deed, subject to taxes for and after 1890, and the figure of $1,000 didn't take. Finally we made it nine hundred dollars. Mr. Harter agreed to that. * * * I think the fact of her financial situation and her inability to pay the taxes was brought out in the conversation. I cannot remember the exact words. * * * I don't know what I said to Mr. Harter about Mrs. Ball's pecuniary condition except that which was brought out that she did not have money to take up these taxes. That is how they accumulated. I told Mr. Harter how many years' taxes there was back at that time."

Harter had been informed before, and was also told at this meeting, of a resolution of the township board to rebate 25 per cent. of the taxes on these lands, if paid. Mr. Shinkman procured the execution of a warranty deed by petitioner, and on July 31st deposited it in a bank in Big Rapids, where Harter had agreed the money should be to meet it on its arrival. The money was not deposited as agreed, and on August 6, 1902, Shinkman wrote to Harter, and received the following reply, dated August 8th:

"Yours of the 6th at hand. You see I must produce an abstract before I can turn over land and receive cash. The abstract will cost eighty-four (84) dollars. Had you sent abstract with deed I could have turned everything at

once. It takes time. Had receipts been sent with deed, I would not have had to go to Lansing to see the auditor general. You see all this extra work takes time and I will not be able to close with full amount of cash until first of next week.

"Hoping that all will be as you claimed when we were in Big Rapids, I have to do what you should have done and it takes me much longer than it would have taken you.

"Yours truly,

"T. HARTER."

On the 19th of August, without notifying Mr. Shinkman or petitioner of any change in their intentions, the defendants purchased of the auditor general the State's title to the lands. On or about August 27th Harter notified the bank that he could not make the deal, and the deed was returned to Shinkman. Harter testified that he abandoned the deal because Shinkman did not furnish an abstract of title as he had promised, but we are satisfied that the agreement did not require Shinkman to furnish an abstract, and that Harter and his principals abandoned the transaction because it was more profitable to deal with the State than with Mrs. Ball.

Petitioner's counsel contend that the decree should be affirmed, because—

*First.* "The rule is well settled in this State that if the circumstances of the particular transaction are such that it would be contrary to the recognized rules of law or of equity as between purchasers and the owner of the existing title that the former should make the purchase, it will not be allowed to prevail but will be treated as a mere mode of payment of the taxes to the State. *Blackwood* v. *Van Vleit*, 30 Mich. 118; *Simons* v. *Rood*, 129 Mich. 345."

It is claimed that defendants come within this rule, for the reasons:

1. That they occupied confidential or fiduciary relations to Mrs. Ball through the information imparted to them, by her agent, of her straitened circumstances and inability to pay the taxes, which information was imparted upon the faith of the agreement to buy the lands.

2. That their taking advantage of the information given them and secretly purchasing the tax title before they notified Mrs. Ball or her agent that they had abandoned the contract, and while she had a right to suppose that they still intended to carry it out, was a fraud upon her, which should estop the defendants from claiming that they purchased the State's title, instead of paying the taxes under the agreement.

Counsel for defendants contend that, the verbal agreement being void under the statute of frauds, no rights can be predicated upon it nor estoppel be based upon it; that no fiduciary or confidential relations existed between the parties; that defendants had a right to abandon the agreement at any time without notice to petitioner; and that there are no allegations in the pleadings nor evidence in the case that the conduct of defendants resulted in any damage to the petitioner other than that which arose from loss of the sale to them.

The verbal executory agreement between the parties was unquestionably void under the statute of frauds. 3 Comp. Laws, § 9509. So far as this agreement was concerned, it bound neither party. Mrs. Ball could have conveyed the premises to another party at any time before her deed was actually delivered to and accepted by defendants upon performance by them of the condition of payment, and they would have been remediless. The defendants could have abandoned the deal at any time prior to accepting the deed, and Mrs. Ball would be remediless so far as the agreement was concerned. As said by the court in *Kelsey* v. *McDonald*, 76 Mich. 188, at page 194:

" As long as he had not accepted the deed, the contract was incomplete, and rested in parol; and his intention to accept it, even if expressed orally, and the payment of money on the contract, and the taking of possession of the land under it, did not complete the contract, or pass the title to him. There yet remained the delivery and acceptance of the deed and the payment of the $4,500. And at least until he accepted the deed, he was at liberty to take advantage of the statute, and recede from his bargain."

This court has many times held that a contract void under the statute of frauds is a mere nullity. *Scott* v. *Bush*, 26 Mich. 418; *Lemon* v. *Randall*, 124 Mich. 687; *Rodgers* v. *Lamb's Estate*, 137 Mich. 241. It necessarily follows that, the oral agreement being absolutely void under the statute of frauds, it cannot be made the basis of an estoppel. *Hickey* v. *Hinsdale*, 12 Mich. 99; *Nowlin Lumber Co.* v. *Wilson*, 119 Mich. 406.

Support for the decree in this case must therefore be found outside of the contract relations of the parties. Petitioner's counsel contend that such support is found in the confidential or fiduciary relations which they claim arose out of the information disclosed by petitioner's agent, and which rendered it inequitable for defendants to purchase in the tax title.

Judge COOLEY, in the third edition of his work on Taxation, vol. 2, pp. 964, 965, discussing "Who may acquire tax titles," says:

"There is a general principle applicable to such cases, which may be stated thus: That a purchase made by one whose duty it was to pay the taxes shall operate as payment only. He shall acquire no rights as against a third party by a neglect of the duty which he owed to such party. This principle is universal, and is so entirely reasonable and just as scarcely to need the support of authority. Show the existence of the duty, and the disqualification is made out in every instance."

In *Blackwood* v. *Van Vleit*, 30 Mich. 118, it was said:

" To preclude any person from making and relying upon a purchase of lands at tax sale, there must be something in the circumstances of the case which imposes upon him a duty to the State to pay the tax, or something which renders it inequitable, as between himself and the holder of the existing title, that he should make the purchase. It was not claimed in this case, so far as the record shows, that there were contract or other relations between Blackwood and Van Vleit that would preclude the latter from buying the former's land for delinquent taxes. If he was precluded, therefore, it must be on the ground that it was his duty to the State to make payment, and that he is not

to be suffered to build up a title on this neglect of duty."

Referring to the case of *Blackwood* v. *Van Vleit*, supra, the court say, in *Sands* v. *Davis*, 40 Mich. 14, at page 20:

"The case of *Blackwood* v. *Van Vleit*, 30 Mich. 118, holds, in conformity with these views, that there can be no estoppel against purchasing tax titles except against one who had a duty to pay the tax or remove the burden."

See, also, *Hain* v. *Robinson*, 72 Iowa, 735; *Jones* v. *Wells*, 31 Mich. 170; *Connecticut Mut. Life-Ins. Co.* v. *Bulte*, 45 Mich. 113; *Maxfield* v. *Willey*, 46 Mich. 252. This question has arisen in a multitude of cases in our own court and elsewhere, and the decisions have turned generally upon the result of the inquiry whether, under the circumstances of the particular case, a duty to pay the taxes rested upon the person buying the tax title growing out of contract or confidential or fiduciary relations.

Were there such confidential or fiduciary relations existing between these parties as to make it the duty of the defendants in equity to pay these taxes? We think not. The relation of these parties was not confidential, or of a fiduciary character. Their relation was that of adversaries with opposing interests; the one seeking to purchase for his own interest, the other seeking to sell for her own interest. No confidence was reposed in defendants. The deed was deposited with the bank, to be delivered to Harter when the full amount of the purchase price was paid, and not till then. The disclosure by petitioner's agent to defendant's agent that the petitioner was financially unable to protect herself by paying the taxes was a purely voluntary disclosure, and brought about no change in the relations of the parties. Petitioner's counsel lay much stress upon the alleged fact that Harter agreed to pay the taxes as part of the consideration, and that, therefore, defendants must be deemed to have paid them in the discharge of their duty under that agreement. We do not think the claim is sustained by the record. The testimony of Shinkman and Lawrence, fairly interpreted, is

that the agreement was for the purchase of Mrs. Ball's interest for $900 subject to the taxes. The testimony of Mr. Shinkman has already been quoted on this point. Mr. Lawrence testified:

"Mr. Shinkman did not want to furnish an abstract. Mr. Harter spoke something about it, but Shinkman said, under the conditions of the sale, the cheapness of the land, that they really couldn't be to the expense of getting an abstract. We proposed to give·him a quitclaim deed. Mr. Harter said: 'I wouldn't accept any such thing. I would rather buy it from the State. I want a warranty deed.' Mr. Shinkman says: 'All right, we will give it to you. We can give it to you.' The parties that bought were to pay the taxes. Mr. Over and his man that bought were to pay the back taxes. It was to be so specified in the deed. The deed was to be given subject to all back taxes after 1890. It was stated very positively by Mr. Shinkman that a warranty deed was to be given, subject to the taxes subsequent to 1890. The deed was to be sent to the Citizens' State Bank of Big Rapids for collection. The consideration was $900."

The deed from Florence Ball to Theobold Harter is the usual form of warranty deed conveying the lands in question for a,consideration of $900, and contains the following clause as to taxes:

"That at the time of the ensealing and delivery of these presents she is well seised of the above-granted premises in fee simple, and that they are free from all incumbrances whatever excepting taxes for the years 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1899, 1900, 1901, and 1902, and she will, and her heirs, executors and administrators shall, warrant and defend same against all lawful claims whatsoever excepting the above-mentioned taxes."

It remains to consider whether the defendants are estopped to claim title to the premises on account of their secretly and fraudulently making the purchase while petitioner was authorized by their acts and the letter of Harter of August 8th in believing that they were proceeding in good faith to carry out the oral agreement. Under the circumstances disclosed by this record, we think that the

conduct of the defendants in purchasing the tax title for their own benefit and in hostility to Mrs. Ball was a fraud upon her.   While defendants had a right to recede from the agreement, wholly abandon it, put themselves in the position of strangers to Mrs. Ball, and acquire the tax title as any stranger might, they had no right to deceive Mrs. Ball, and fraudulently induce her to believe that they honestly intended to carry out the invalid bargain, when, as a matter of fact, they had determined not to carry it out. In our view of the evidence, this is precisely what defendants, through their representative, did.   At the time when Harter wrote the letter of August 8th we are satisfied that defendants had determined to abandon the bargain in case they should ascertain that the auditor general could convey a good title.   We are brought to this conclusion by the evasive character of the letter itself, and by the fact that Harter in his testimony assigns false reasons for the defendants' conduct.   Harter testified as follows:

" I made the proposition that if they furnished the deed and an abstract, so when these parties came they can go before any legal authority and have it examined and approved, I would give them $900; but, if the title was not good, I could not get anything because I couldn't transfer it.   Well, the result was that Mr. Shinkman said he thought he had an abstract.   I says, ' Now be sure to have it,' and, in order to induce him to have it, we were to put as they say —we put up $100 to pay for all those expenses, and get out an abstract, and have everything straight, because I couldn't deal any other way.   But what was my disappointment when he sent in he had the deed.   He said he had back papers that would show this part.   I showed him the report of the county treasurer.   I showed him that he said they were to be paid to 1900.   I says, ' You say that is incorrect.'   He says, ' It is; I will show you it is because I have the receipts.'   I says, ' You send the receipts with the abstract, and that $900 will be there as quick as the papers come.'   When I went to the bank and examined them, I found that he had no abstract, no tax history, to show there was.   And Mr. Over came up and I said:   ' The whole thing has fell through.   We

haven't a thing for our trouble. It is all gone. There is only one way to do in this matter, and that is to go to Lansing and examine it ourselves—go to the auditor general.' We took the train that afternoon, and went direct to Lansing, seen the auditor general, and got specific instructions regarding taxed land.   *   *   *

"Mr. Over and I went to Lansing and examined the tax title right after we had examined the deed Mr. Shinkman sent to Big Rapids. When we found the papers were not there, Mr. Over, by his own suggestion—we went down there to see who owned the land, because we couldn't prove anything by that warranty deed. It must have been two or three weeks after the 31st of July, 1902, that we went down."

Harpham testified:

"Mr. Over and myself were present in the office of the auditor general of the State of Michigan, and made the purchase ourselves on the 19th day of August, 1902."

Both Mr. Shinkman and Mr. Lawrence testified that it was distinctly agreed that no abstracts should be furnished, and we have no doubt of the truth of their testimony. Yet Harter pretends that he was greatly disappointed when he found that no abstract had been furnished, and that the deal was abandoned for that reason. His letter is also inconsistent with this claim, for, although he intimates that Shinkman should have furnished the abstract, he also intimates that he is proceeding to have it prepared himself, and for that reason will require time. Again, he gives the court to understand that up to the time they went to the bank they did not know that there had been no abstract furnished. They evidently met at the bank on August 18th, 11 days after his letter, which disclosed that he knew that no abstract had been furnished. He says that after finding there was no abstract the only thing left for them to do was to go to Lansing and examine it for themselves. His letter indicates that he was then—August 8th—prosecuting his inquiries in the auditor general's office, as we have no doubt he was, and wrote the letter to reassure Mr. Shinkman and gain time. The fact,

also, that these parties met at Big Rapids on August 18th, determined, as they claim, to abandon the deal because no abstract was furnished, and yet never said a word to any one connected with the bank, so far as the record discloses, about abandoning the agreement, till August 27th, after they had acquired the State's title, is quite significant, and not consistent with fair dealing. The form of Harter's letter is also worthy of consideration. It is evasive. It avoids any direct statement that defendants will carry out their verbal agreement, but was, in our opinion, designed and well calculated to deceive Mr. Shinkman into the belief that they were honestly intending to pay for the deed, and that it was only a question of a few days when they would do so. Eleven days later, without a word to Shinkman of any change in their intentions, and while he had a right to believe that all of their acts were directed to carrying out the bargain, they purchased the State's title, with the intention of compelling Mrs. Ball to redeem or lose her land. Having lulled Mr. Shinkman into a sense of security by their fraudulent conduct and assurances, whereby they were enabled without hindrance to obtain the title, a court of equity will not permit them to reap the fruits of their fraudulent representations and concealments. They induced Mrs. Ball's representative to believe that they were acting in good faith in carrying out the contract, and, relying upon this belief, he permitted the deed to remain in the bank subject to their acceptance, and refrained from taking any steps whatever to protect Mrs. Ball's interests. Having falsely represented to Mrs. Ball that the things which they had done, were doing, and were about to do were in the carrying out of the agreement, and she having relied upon these representations and refrained from taking any steps to protect herself, and in consequence having been placed in a situation where she cannot be restored to her original condition, we think that it would be inequitable to permit defendants to enforce against Mrs. Ball the rights resulting from their fraudulent practices. The decree of the circuit court in

chancery restores the parties to their original position, is equitable and just, and is affirmed with costs of both courts.

MOORE, C. J., and McALVAY, GRANT, and MONTGOMERY, JJ., concurred with BLAIR, J.

OSTRANDER, J. (*dissenting*). The decree in this case should be reversed, for the following reasons:

1. Although the petition is filed "in the matter of the general petition of the auditor general of the State of Michigan for the sale of lands in Newaygo county for unpaid and delinquent taxes for the years 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1899, 1900, and 1901," and although there are some averments in the petition, made upon information and belief, that the court was without jurisdiction to adjudicate the taxes delinquent, it is evident that the case attempted to be made involves purely private rights in no way dependent upon or involving any tax proceedings. Petitioner should be treated like the ordinary complainant in a bill in equity.

2. In a court of equity the complainant must stand or fall by the case made by the bill. This rule is too familiar to require citation of authority. The theory of the bill is an agreement by defendants to pay the taxes in question, which agreement, with information obtained as to petitioner's inability to pay them, created relations of such nature that defendants were in equity bound to pay the taxes.

3. The only contract or agreement proven is one made between petitioner's agent and one Theobold Harter, and that agreement was to pay to petitioner $900 for a deed of the lands, subject to the taxes. There is no proof that defendants, or any one of them, ever directly or indirectly agreed to pay the taxes upon the lands.

4. The decree below is based upon the finding that the material facts stated in the petition are true. The most material facts stated are that a verbal executory contract was made with Harter as representative of defendants

whereby said defendants were to furnish the money to pay off all back taxes, and that petitioner was to convey her title for the net sum of $900 over and above said delinquent taxes; that defendants disregarded their contract, and, in violation of their duty requiring them to pay and care for said taxes, purchased the land for such taxes. Treating these alleged facts as untrue, the basis for the decree is gone.

5. It is conceded that the agreement which was made, namely, to buy petitioner's title, and to pay her $900 therefor, which rested entirely in parol, is void, and that neither an obligation nor an estoppel can be based upon it.

6. Defendants owed no duty, either to the State or to petitioner, to pay the taxes.

7. Conduct is not actionably fraudulent, within legal definitions, which does not defraud. There is no proof in this record that petitioner has been defrauded. Petitioner has as good title to these lands now as she had when the State owned the tax interest. It does not appear that she has done anything except to make a deed, or refrain from doing anything, in reliance upon any promise, undertaking, or conduct of defendants, or of their alleged agent, Harter.

8. Theobold Harter is the person who made whatever agreement was made with the agent of petitioner. It was to him that petitioner's inability to pay the taxes was confided, if to any one. The deed was made to him. It is sought to reach defendants by the claim that Harter was their representative, and that what he knew and said and did, were the knowledge, sayings, and doings of defendants. The proofs fairly sustain the conclusions that Harter desired control of petitioner's title for the purpose of selling it to whomsoever he could find to buy; that he interested defendant Over, and Over endeavored to find a purchaser, and did induce two men to look over the lands. These men did not buy. Over is a real estate agent. He testifies that he never expected to buy the lands for

himself until he and Harpham visited them. Neither of the defendants ever saw petitioner or her agent, nor had any communication with them or either of them. Over interested defendant Harpham. Harter, whom they saw, claimed to be well acquainted with the land, and to know of several good tracts of land that could be had if parties could handle them. When defendant Harpham had seen the lands, or some of them, and learned that the State held a title to them, he went with Over to Lansing, and there purchased the interest of the State. It is said in the brief for petitioner that Harter was agent for both Over and Harpham, because he was negotiating with Over, and Over and Harpham are partners, and the employment of an agent by one partner " is an employment by the copartnership itself." But there was no copartnership. It is true that both defendants say that they are partners in this particular deal, but, taking all of the testimony into consideration, it is plain that they are no more than tenants in common of the land. The record discloses the fact, which is common knowledge, that the stump lands and pine barrens of this State, heretofore considered practically worthless, have been sought and bought for cattle ranges by owners of cattle. Harter knew this, and was anticipating a sale of these lands to some such possible buyers. That he had authority from defendants, or from any one else, to buy land for them, or to represent them to petitioner, is, upon this record, negatived.

The decree should be reversed, with costs of both courts to defendants, and a decree entered in this court granting the relief prayed for in defendants' cross-bill to the extent of quieting their title to the lands in question and awarding them possession thereof.

CARPENTER, J. I do not think that petitioner was injured by the alleged fraud of defendants, and I therefore concur in the foregoing opinion on the ground stated in paragraph 7.

HOOKER, J., did not sit.